(Decided 9th February, 1880.)

---

Thomas I. Hall & Company *vs.* The Farmers' National Bank of Annapolis and William H. Tuck, Committee of Mrs. J. C. S. Wilcox.

*Construction of an Agreement for Distribution of a Debtor's Assets—Rule of Law in Construing contracts.*

An agreement entered into between the mortgagee of a debtor and others, unsecured creditors of the debtor and sureties for him, by which provision was made for the application of certain assets of the debtor to the payment of his debts, controls the whole matter, fixes the rule of distribution, and makes the law for the case.

The rule of law is, that the Court will give to a contract that construction which will bring it as near the actual meaning of the parties as the words they saw fit to employ will permit, consistently with the rules of law. The rule of law further requires, that words shall not be forced away from their ordinary signification to one entirely different, but where the language used is ambiguous, equivocal or obscure, that meaning will be accorded to it which will effect the obvious intention of the parties.

Appeal from the Circuit Court for Anne Arundel County, in Equity.

The case is stated in the opinion of the Court.

The cause was argued before BARTOL, C. J., BOWIE, BRENT and IRVING, J.

*Charles Marshall,* for the appellants.

*James Revell* and *William H. Tuck,* for the appellees.

IRVING, J., delivered the opinion of the Court.

There are two questions presented by this record, and both, for their proper decision, depend on the construction which the agreement of the parties touching the subject-matter of the controversy, should receive; and that agreement must be considered in the light of the facts which gave rise to it, and are referred to in it.

George Wells being indebted to the Farmers' National Bank of Annapolis, upon thirteen notes, of which he was a joint maker, and one accepted draft, and a guaranty by way of securing payment of the same, executed two mortgages to the Bank, dated respectively on the tenth of January, 1877, and the twenty-eighth of February, 1877. Sundry persons were jointly liable with George Wells upon the several undertakings, some upon one and some upon another of them. Three others of the joint debtors, John B. Wells, Arthur Wells and Joshua Brown, also gave mortgages to the bank to secure the several claims on which they were respectively liable. All the mortgages appointed the Bank or Alexander Randall, trustee, to sell the property in the event of default on the part of the mortgagors to comply with their stipulations of the mortgages.

Thomas I. Hall & Co. and John W. Anderson having claims against George Wells, which were in no way secured, and Mrs. F. C. S. Wilcox having a claim which was supposed to be partially secured by the assignment, in whole, or in part, of a life insurance policy, for the purpose, as they say, of effecting an "arrangement, that

may result more beneficially to all the parties interested in the estate of George Wells than by reference of their rights and priorities to an adverse and hostile litigation," on the 29th of June, 1877, entered into an agreement with the Bank and the "sureties on the notes and draft described in the mortgage" by which they, as unsecured creditors ·of George Wells, were admitted to *a pro rata* participation in the estate of George Wells mortgaged to the bank.

The provisions of the agreement are as follows:

1. "That all the property, real, personal and mixed, so conveyed by George Wells to the bank, and so much of the policy of assurance assigned to Mrs. Wilcox, should be sold, or collected, and received by the attorney of the said bank named in the said mortgages or assignments, or by any other attorney or solicitor thereto to be appointed by the Circuit Court for Anne Arundel County, in equity."

2nd. "That the proceeds shall first be applied as specified in said mortgages, to defray costs, commissions and expenses, and then to the punctual payments of insurance premiums upon the life insurance and fire insurance policies so transferred and assigned by said George Wells, and to such other legal fees and expenses as may be allowed by the Court."

3rd. "In the event of said policies of fire and life insurance falling in before the completion of the trust, the proceeds of such policies shall be applied for the benefit; in the first instance, of the party to whom the same may heretofore have been assigned by the said George Wells."

4th. "The nett proceeds of sales of all said assigned property so mortgaged and assigned, shall be applied towards the *pro rata* discharge of the claims of the several creditors enumerated herein, the exact amount of the unascertained claims, (meaning thereby all claims herein enumerated, except those named in said mortgages,) to be particularly ascertained in the progress of the cause."

5th. "In case either of the unsecured creditors afore-said have received, or may hereafter receive any property or security of any description from the said George Wells, not herein referred to, it is hereby specially agreed by the undersigned, creditors, that any such property or security shall be turned over by the party receiving the same to the trustee or attorney named in said mortgages, or his successors, to be applied by him for the purposes of this agreement."

This agreement contained the following proviso : " pro-vided the assent of all the several sureties on the said notes and drafts shall be first obtained, agreeing that the bank may become a party to the present arrangement." Such assent was appended to the agreement under the hands and seals of the persons so interested, so that they, thereby, become parties also to the agreement. The trustee disposed of the property mentioned in the mort-gages, reported to the Court, and auditor's reports were made, distributing the proceeds as the auditor understood the agreement. Exceptions were filed to the auditor's report on the behalf of Thomas I. Hall & Co., and by agree-ment, the reports in all the estates were considered together. The ground of exception is stated to be that the auditor has allowed a dividend to the bank on the full amount of all the notes due the bank, without first credit-ing them with the dividend audited the same claims from the other mortgaged estates as the exceptants contend should have been done. The Circuit Court for Anne Arundel County overruled the exceptions and ratified the audit, and that order forms the first subject of our con-sideration.

The learned Judge who decided the case below, thought the terms of the agreement by proper construction, settled the question adversely to the exceptants, and we fully concur with him in that view. It is clearly not a case to apply the equity rule, that where one party has two funds

liable to the payment of his claim, and another creditor only one to which he can resort, the party having two must take the one which will leave the other free to the other creditor. Courts of equity have never interfered to compel a creditor having two funds from which to get paid, first to resort to the one on which another creditor had no lien, unless the fund or property answerable for his claim was all the property of the same debtor. Lord ELDON, in *Ex parte Kindall*, 17 *Ves.*, 520, said "If I have a demand against A. and B., the creditors of B. have no right to compel me to seek payment of A., if not founded in some equity giving B. the right for his own sake to compel me to seek payment out of A." Judge STORY, 1 *Equity Jurisprudence, sec.* 645, after quoting the language of Lord ELDON, condenses the law on that subject into this sentence: "Where a creditor has a right to resort to two persons who are his joint and several debtors, he is not compellable to yield up his remedy against either; since he has a right to stand upon the letter and spirit of his contract, unless some supervening equity changes or modifies his rights." Here the Bank is the creditor of George Wells, and all the joint makers of the notes, set out in the mortgage, (and allowed a dividend in the audit on George Wells' estate,) while the exceptants have no claim against any body but George Wells, and so far as this trust estate is concerned have no claim on the trust estate of George Wells, were it not for the agreement admitting them to share in the proceeds thereof. Unless that agreement, therefore, gives them a right to claim against the Bank, and against the other joint debtors, that the joint debtors shall first be resorted to for payment by the Bank, before the Bank can claim against the exceptants to participate in the fund arising from George Wells' estate, they have no such right to be enforced. Such construction involves the unreasonable supposition that the Bank by that agreement designed to waive its claim on George

Wells' estate, which it had taken in security, unless the
estates of the other joint debtors should prove insufficient
to pay its claim; or the equally unwarrantable implica-
tion of a right to the unsecured creditors to share in the
estates of the other joint debtors, against whom thay had
no claim.    The recitals and terms of the agreement
plainly exclude such an idea.    The notes were joint and
several notes, and the Bank had each and all bound for
the whole amount of its claims, and could look to any one
for payment.    It had taken security from several of them.
The appellants for reasons satisfactory to the Bank, and
to the co-debtors with George Wells, had been by agree-
ment between them all, admitted to participate *pro rata*
in George Wells' estate mortgaged to the Bank; but that
agreement did not accord the appellants any thing more.
It did not provide for their sharing any of the securities
the Bank had taken from the other debtors.    The securi-
ties certainly would never have consented to such an
agreement as the appellants contend was made.    Upon
what basis, then, was the *pro rata* computation to be
made?    Clearly upon the claims mentioned in the mort-
gage according to the amount therein designated, and
upon the unsecured claims as they might "be ascertained
by proof in the progress of the cause."    The amounts of
the several secured claims due the Bank are named in the
mortgage, and it is upon them as set out in the mortgage,
the agreement provides the Bank shall receive a *pro rata*
share of George Wells' estate.    The fourth clause of the
agreement provides "the exact amount of unascertained
claims (meaning thereby all claims herein enumerated
except those named in the mortgage) to be particu-
larly ascertained in the progress of the cause."    The pro-
vision for the ascertainment of the amount of *one class* of
claims for the purpose of distribution to them excludes
the idea that any computation or proof was necessary to
the ascertainment of the others.    Judge HAMMOND, most

forcibly says that "the amounts of those claims stated in the mortgage are adopted, and upon such amounts the *pro rata* is to be computed. But not only are these unsecured creditors under an agreement with the Bank to have the distribution made *pro rata* in the sums named in the mortgages, but they have agreed with the other parties in interest to do the same. Before these three creditors were authorized to come in, under the mortgage, they, and the other parties in interest agreed that the arrangement might be made, and it would not do now to say that this arrangement may be disregarded; and that Brown & Hammond, Wilson & Swann, Taylor, Handy and others, may have their liabilities increased by reducing the Bank's dividend out of George Wells' estate, and yet leaving to these creditors all the advantage of sharing the proceeds of the mortgage sale."

The Bank can have but one satisfaction of its claim, and it is abundently clear from the record that all the estates will not discharge it. But if it were otherwise, and the several distributions more than cancelled the debt, the persons interested in such a contingency would seek their remedy, whatever that might be. It would be a matter *inter sese* with which the appellants have nothing to do. In our opinion it makes no difference, that in point of fact, on some of those notes George Wells was only a surety for the other makers, John B. Wells and Arthur Wells. It is a fact outside the notes and the mortgage, for in the notes and in the mortgage they are described not only as joint, but *several* makers. For the purposes of this case, and distribution, the agreement as we construe it, requires George Wells to be regarded as a several debtor for each sum named in the mortgage, and as if he was the only debtor. Independent of the agreement, and if nobody was secured, the rule which is contended for by the appellants would be applied, and in cases where George Wells was not the principal debtor, the claim would be credited

with the dividend from the principal debtor's estate, before a dividend would be computed from George Wells' estate. The agreement is to be construed in the light of all the facts disclosed by it. Although George Wells was security for John B. and Arthur Wells on some notes, on other notes mentioned in the mortgage they were security for him, and it was important to them that his estate should pay as much as possible to relieve them, so that an influential motive is readily seen for their assenting to the arrangement. Being security for each other and to prevent their having to pay their own debts and George Wells' also, they agreed to this arrangement which simplified the whole matter by giving the Bank and the unsecured creditors of George Wells, a *pro rata* distribution of George Wells' estate in the hands of the trustee, in which distribution all the claims on which George Wells was bound to the Bank were *designated* to participate in the fund. We do not think the parties contracted for a distribution according to the rule in chancery, which would have been applied, if it had been an ordinary deed of trust. It is stated in the preamble of the contract that "with a view to *an* equitable distribution," and to avoid "hostile litigation" the agreement was made. It is not stated that it is done with a view to a distribution according to chancery rule," but "*an equitable distribution*" is the term used, and then as we understand it, they fix what they have agreed is to be that equitable distribution. It is one which they have established for that case for the settlement of their controversies, and as we have said without resorting to hostile litigation. In our opinion the agreement controls the whole matter and makes the law for the case. The auditor made the distribution in accordance with the view we have taken, and we think was right. It was not necessary to apply the dividends from John B. Wells and Arthur Wells' estates to any of the claims before giving them a *pro rata* share from George Wells'

estate.  The contract as we have construed it does not
provide for that mode of proceeding.  Agreeing as we do
with Judge HAMMOND in the rule of distribution to be
applied, and as fixed by the agreement, it is not necessary
to discuss the authorities cited, and relied on by the appel-
lants' solicitor, as they do not properly bear on this case.
The Circuit Court was right in overruling the exceptions
to the auditor's reports.

One other question remains, which involves the con-
struction of the agreement in another particular.  Thomas
I. Hall & Co., after their exceptions to the auditor's report
had been overruled, and the audit had been ratified, filed
an interlocutory petition in the nature of additional ex-
ceptions to the auditor's report, which was under agree-
ment, dismissed *pro forma,* for the purpose of appeal.
No objection seems to have been made on the ground of
the exception being too late, and of course we shall dis-
pose of it on its merits.  By that petition he objects to the
allowance to Mrs. Wilcox, and to the payment of the
premiums on the policy assigned to her, unless the policy
of insurance assigned to her was brought into the general
trust estate; and insists that by the true construction of
the agreement, she is bound to bring said policy into the
fund.  The auditor has allowed Mrs. Wilcox her due
proportion of the estate, and has also charged against the
estate the premiums paid on her policy, as provided for in
the agreement; and has then deducted from her dividend
the amount so advanced by the estate to pay the pre-
miums on the said policy.  By the first clause in the
agreement the policy of insurance assigned to Mrs. Wil-
cox, was passed over to the trustee for collection in certain
contingencies.  By the second clause, provision was made
for the payment of the premiums falling due on the fire
and life policies.  By the third clause which has already
been quoted, it was provided that in the event of the policies
of life or fire insurance "falling in *before the completion of*

*the trust,*" the proceeds were to go to the parties holding the policies or assignments of them. By the third and last clause, which also has been quoted heretofore, the appellants contend that Mrs. Wilcox is bound to bring in for general distribution the policy of insurance on the life of George Wells, which had been assigned to her. In maintenance · of this view it is insisted that the words "before the completion of the trust" in the third clause of the agreement, must be construed to mean "before the perfection of the instrument creating the trust," or "before the perfection of the trust." They insist that it is used with reference to the possible delay in securing the assent of the persons whose assent is stipulated to be obtained before the agreement was to be an operative agreement, and that it does mean "settlement of the trust as the words naturally import." The rule of law is, that the Courts will give to the contract that construction which will bring it as near the actual meaning of the parties as the words they saw fit to employ will permit, consistent with the rules of law. The rule of law further requires that words shall not be forced away from their ordinary signification to *one entirely different;* but where the language used is ambiguous, equivocal or obscure, that meaning will be accorded to it, which will effect the obvious intention of the parties. Here the language is somewhat ambiguous, because of the subjects to which it is applied, and the thing intended to be described. A trust was being created which required certain things to be done before the trust, as to the parties who had already signed the instrument creating it, should be regarded as existing. It would not be a complete trust till the assent of certain persons should be obtained, agreeing that the Bank might make the agreements creating the trust. The language, therefore, in the third clause of the agreement, "before the completion of the trust," may, without torture, be held as referring to the condition precedent, to

the perfection of the trust, and to mean "before the trust was fully created." Such construction is reasonable; it would be, providing, that if the rights acquired by the assignments, should have matured by the death of the party insured, or the destruction of the property by fire, before the arrangement in progress was *completed*, in such case the party should not be held bound to surrender that which was no longer only a possibility, but was immediately enjoyable. The word "trust" is evidently used to designate the instrument creating it, and it is by no means an unusual mode of expression. Any other holding would require the trust to be wholly settled up, before the right of augmentation of the trust estate, by the falling in of the policies could arise. If the trust was completely settled, then of what use would other funds be? If the other funds were needed, then the trust would not be completely settled, and the agreement could not refer to that condition of things. The words must have a rational interpretation. The parties intended the policies to play some part in the trust for the payment of the debts enumerated or mentioned. Mrs. Wilcox in consideration of immediate enjoyment of a portion of the available estate of George Wells, her father, surrendered the policy, which might or might not become available for *pro rata* distribution when it should fall in; unless it should fall in before the agreement was fully consummated, and the trust perfected; in which last mentioned event she was not to be deprived of the benefit of the policy, but was to stand, as to it, as if she had not joined in the agreement. In consideration thereof, she was not only admitted to *pro rata* distribution of other assets to which she would have no right, but the policy was also to be kept alive for common benefit from the trust estate, (after the trust should be vitalized, by the assent of parties as provided in the agreement.) By this means, Mrs. Wilcox was relieved of the necessity of keeping the policy alive herself. This

Hall & Co. *vs.* Farmers' Natl. Bank of Annapolis, *et al.*

interpretation of the language only gives to the word " completion " the sense of " perfection." If the word " perfection " had been used instead of " completion," we apprehend no controversy would have arisen; and in giving it that meaning we do no violence to the language, while we carry into effect the intention of the parties, as clearly indicated by the other parts of the agreement.

Entertaining this view we must reverse the *pro forma* order dismissing the petition of Thomas I. Hall & Co., passed on the 21st day of March, 1879; and it appearing that the order of final ratification of the auditor's report was passed while this petition was pending, which, it is admitted at bar, was in the nature of additional exceptions to the auditor's report, and shall be so treated, the order ratifying the auditor's report on George Wells' estate, passed on the 28th day of February, 1879, must also be reversed to the end that the audit may be corrected in accordance with the views we have herein expressed, to wit, that the policy of insurance assigned to Mrs. Wilcox, may be treated as belonging to the trust estate for the common benefit of all the distributees under the agreement, and that the premiums may be paid out of the fund and not be charged against her dividends.

*Affirmed in part, and reversed*
*in part, and cause remanded,*
*costs to be paid out of the fund.*

(Decided 11th February, 1880.)

BARTOL, C. J., filed the following opinion, concurring in part and dissenting in part:

One of the questions raised by the appellants' exceptions to the auditor's report, is as to the amount for which the Bank is entitled to prove against the mortgaged estate of George Wells. The solution of this question depends

upon the true construction of the agreement dated February 3rd 1877.

The Bank having received from George Wells two mortgages for the purpose of securing the payment of his several debts and liabilities due the Bank, therein enumerated, upon some of which he was principal debtor, and upon others surety, by the agreement assented that the appellants and others, unsecured creditors of George Wells, should have the benefit of the mortgage security held by the Bank. The object of the agreement as stated on its face was to effect *"an equitable distribution of the estate of George Wells among said creditors."*

It provided that the mortgaged property should be sold, and by the *4th Article,* "that the net proceeds of sale * * * shall be applied towards the *pro rata* discharge of the claims of the several creditors enumerated herein, the exact amount of the unascertained claims (meaning thereby all claims herein enumerated, except those named in said mortgages,) to be particularly ascertained in the progress of the cause."

It appears that for some of the liabilities of George Wells enumerated in the mortgage, upon which he was surety, the Bank held mortgages from the principal debtors.

It further appears, the property conveyed by these last mentioned mortgages had been sold, and a portion of these debts had been paid to, or received by the Bank out of the proceeds of these sales. Notwithstanding this, it appears by the auditor's account, that in distributing the proceeds arising from the sales of the property mortgaged by George Wells, the Bank has been allowed a dividend upon the whole amount of the debts, without any deduction or abatement for the moneys received from the property of the principal debtors. It seems to me that in this respect, the auditor's account is erroneous. If the fund in Court had arisen under a deed of trust from George Wells, for

the benefit of his creditors equally, the equitable rule of distribution would require that the Bank should apply as a credit upon its claims against George Wells *where he was surety,* any moneys actually received from the principal debtors in part payment of the debts, and it would be allowed to prove against his estate only for the balance.

This equitable rule is well established by the authorities, and I do not understand that it is questioned by the appellee's counsel.

. The same rule would apply, if the original mortgages had been made in favor of the appellants as well as the Bank.

This is precisely the effect of the agreement as I construe it.

It is argued that this equitable rule of distribution is to be departed from in this case, because of the terms of the agreement, and to support this view the 4*th Article* before cited is relied on.

By this Article, it is said the right of the Bank was secured to claim under all circumstances, a dividend out of George Wells' estate, on the whole amount of the debts mentioned in the mortgage. I do not so construe it. The effect of this provision was to admit that his liabilities to the Bank were correctly stated in the mortgage, and to leave the exact amounts due from him to the other creditors to be thereafter ascertained, and to provide for a *pro rata* distribution among his creditors. If it had turned out that any of his debts to the Bank enumerated in the mortgage, upon which he was liable, as surety, had afterwards been actually paid by the principal debtors, it could hardly be successfully maintained that the Bank would be allowed to prove such debts and receive a dividend thereon. In the same manner, where a part of the debts has been paid by the principal debtors, or which is the same thing, has been in part satisfied out of the property of the principal debtors held by the Bank as security, it

seems to me there is nothing in the agreement to entitle the Bank to prove against George Wells' estate for the whole amount of the original debts. To give the agreement such a construction would defeat the end which it was intended to accomplish, and which is expressed on its face, viz., " *an equitable distribution of the estate of George Wells among said creditors.*" ·

Of course in all cases where he is the principal debtor, the right of the Bank is to prove for the whole, for the benefit of the sureties, who are parties to the agreement.

For these reasons I dissent from the opinion of the majority of the Court upon this question. In other respects I concur in that opinion.